UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

MARGARET CULLEN,                      :

                    Plaintiff,        :
                                          08 Civ. 6202 (HBP)
     -against-                        :
                                          OPINION
RONALD STEINBERG, RICHARD             :   AND ORDER
STEINBERG, DAVID STEINBERG
and JAYSON STEINBERG,                 :

                                      :

                    Defendants.       :

----------------------------------X


          PITMAN, United States Magistrate Judge:


I.  Introduction


          This action arises out of a loan made by defendants

Ronald Steinberg, Richard Steinberg and David Steinberg to

Wholistic Change, LLC, a corporation which had been formed for

the purpose of obtaining the loan.  Plaintiff Margaret Cullen was

the President of Wholistic Change, LLC and conveyed to the

corporation residential property at 653 Jacey Drive, Fort Lee,

New Jersey that was used to secure the loan.  Jason Steinberg

(sued as Jayson Steinberg) is an attorney who represented lenders

Ronald, Richard and David Steinberg in the loan transaction.

Plaintiff claims a loss in the amount of the loan proceeds she

alleges she never received and seeks treble damages based on

claims of fraud, legal malpractice and usury.

The parties consented to my exercising plenary juris-
diction over this matter pursuant to 28 U.S.C. § 636(c), and the
matter was tried before me, without a jury, on January 11 and 12,
2010.  Based on the testimony and other evidence offered at trial
and the parties' pre- and post-trial submissions, I make the
following findings of fact and conclusions of law.

II.  <u>Findings of Fact</u>

    A.  <u>The Parties</u>

    1.  At the time the action was commenced, plaintiff was
a citizen of New Jersey.  Plaintiff is the president of Wholistic
Change, LLC, a corporation formed in New Jersey for the purpose
of obtaining a loan from Ronald, Richard and David Steinberg.

    2.  Ronald Steinberg, Richard Steinberg and Jason
Steinberg are citizens of New York; David Steinberg is a citizen
of Florida.  Ronald and Jason Steinberg are brothers, Richard
Steinberg is their father and David Steinberg is their uncle.
Ronald and Richard Steinberg are in the business of making loans
secured by mortgages on real property to borrowers who are unable
to obtain financing from conventional lenders.  David Steinberg
also sometimes contributes money to these loans.  Jason Steinberg
is an attorney licensed to practice in New York and handles the
real estate aspect of the business, including representing
Ronald, Richard and David Steinberg in loan transactions.

3.  As of March 16, 2007, Wholistic Change, LLC was the owner of residential property conveyed to it by plaintiff (DX[1] 12).  On March 16, 2007, Ronald, Richard and David Steinberg, represented by Jason Steinberg, made a loan to Wholistic Change, LLC secured by this property.

B.  Events Leading up to the
    March 16, 2007 Closing

4.  In 2004, plaintiff received $1.9 million in compensation for her husband's murder in the 9/11 attacks on the World Trade Center.  She invested some of the money in real estate, buying residential property at 653 Jacey Drive in Fort Lee, New Jersey in 2004, and at 1400 Outlook Avenue in the Bronx in 2006.

5.  Plaintiff had an attorney for the financing and purchase of the New Jersey property and for the purchase of the Bronx property, which plaintiff bought without financing.

6.  Plaintiff lived at the 653 Jacey Drive property from 2004 to January 2006, and again starting in late March 2007. In the interim she lived at 1400 Outlook Avenue in the Bronx.

7.  At a party in December 2006, plaintiff met Maximo (Max) Almonte, who had gone to grammar school with her.  Almonte initially told plaintiff he was a stock broker; plaintiff learned in May 2007 that he was actually a felon who had been convicted

---

[1]"DX" refers to defendants' exhibits.

of real estate fraud.  Almonte moved in with plaintiff at 653
Jacey Drive two days after meeting her at the party.

8.  In late December 2006 or early January 2007,
Almonte introduced plaintiff to Robert (Bob) Kotch, who, plain-
tiff later learned, had been convicted of mortgage fraud and had
met Almonte while they were both in prison.  Almonte took plain-
tiff to Kotch's office in Manhattan's Wall Street area to discuss
plaintiff's involvement in a potential real estate business in
which Kotch and plaintiff would buy foreclosed homes and resell
them for a profit.  Kotch represented to plaintiff that if she
invested $100,000, she would be able to earn an additional
$90,000 in a short amount of time.  Plaintiff orally agreed to
this transaction during their meeting.  She told Kotch she did
not have the cash but that she owned the 653 Jacey Drive property
and that it was not subject to any mortgage.  Kotch told plain-
tiff that he could arrange a $100,000 loan for her, secured by
that property.

9.  At some point before March 2007, plaintiff and
Kotch had another meeting at which Kotch confirmed their plans to
buy and sell foreclosed homes.

10.  Plaintiff, possibly through Kotch, Almonte or a
mortgage broker named Steve Gold, applied to Wachovia Bank and
possibly to other conventional lenders for a loan backed by the

653 Jacey Drive property, but was unable to obtain a loan from these sources.

11.  Kotch and/or Almonte had Gold, who operates under various company names, including "Be Approved," arrange a loan to plaintiff from Ronald, Richard and David Steinberg, purportedly to enable plaintiff to invest in the proposed business with Kotch.

12.  Gold had brought the Steinbergs a few loan trans-actions previously and had known Ronald Steinberg for about a year.  Ronald Steinberg had known Kotch since January 2007, when Gold introduced them, and the Steinbergs had loaned money to Kotch's companies four times.  None of these loans had been paid off as of January 11, 2010.  The Steinbergs did not know Kotch was a felon until receiving the complaint in this action.

13.  Gold had told Ronald Steinberg that plaintiff needed money quickly but had not been able to obtain a conven-tional loan, and that she wanted to borrow the money through a corporation called Wholistic Change, LLC, secured by the property at 653 Jacey Drive.  Gold also told Ronald Steinberg he would be paid back within six months.

14.  Ronald Steinberg attempted to inspect the 653 Jacey Drive property a few days after speaking with Gold, but could not gain access to the property because it was located within a gated community.

15.   Based on his view of the exterior of the community within which the 653 Jacey Drive property was located and a statement by Gold that plaintiff had paid $470,000 for the property, Ronald Steinberg agreed to lend Wholistic Change, LLC $275,000.  Ronald Steinberg then contacted Jason Steinberg to set up a closing for the loan.

16.   On or about March 13, 2007, Gold spoke with Jason Steinberg.  He told Jason Steinberg that plaintiff wanted to take out the loan in order to go into business with Kotch, clean up her credit, and get some cash.  Gold told Jason Steinberg that 653 Jacey Drive was an investment property.

17.   Gold also ordered a title report on the property and sent it to Jason Steinberg.  The title report identifies the prospective mortgagor as plaintiff, not Wholistic Change, LLC (DX 3).

18.   Jason Steinberg scheduled the closing for March 16, 2007.

19.   Neither plaintiff nor Wholistic Change, LLC filed any formal loan application with the Steinbergs.

20.   On or around March 13, 2007, at the request of Jason Steinberg, plaintiff signed a letter on behalf of Wholistic Change, LLC, authorizing the disbursement of $104,000 from the loan proceeds to "Private Lenders" (DX 5), the company Kotch purportedly was going to use to buy and sell foreclosed homes in

partnership with plaintiff.  It is Jason Steinberg's practice to get written authorization from the borrower before a loan closing if any of the loan proceeds will be disbursed directly to third parties.

21.  On or around March 13, 2007, plaintiff signed an agreement with Ellissa Liebowitz of Be Approved which stated that plaintiff agreed to pay Be Approved, the broker, three percent of the total loan amount (DX 6).

22.  Both Jason and Ronald Steinberg understood the loan was being made to a corporation rather than an individual.

C.  Background on Defendants'
    Lending Business

23.  Ronald and Richard Steinberg, sometimes with contributions from David Steinberg, are in the business of making secured loans to borrowers who have been turned down by conventional lenders because of bad credit, bad payment history and/or lack of a demonstrable income.  The Steinbergs' loans are typically one-year loans at 15% interest and three points, secured by real property.  The Steinbergs do not require a formal application, make a credit inquiry or do a background check on borrowers.  Rather, they look at the collateral and are willing to lend as long as the property's value exceeds the amount of the loan and they can get the first mortgage on the property.  The Steinbergs find borrowers through repeat business and word of

7

mouth.  They lend primarily to corporations -- usually builders, bodegas, restaurants and other commercial entities -- but they understand they can make up to five loans to individuals each year without a special license.  The Steinbergs claim to lend to individuals only when the property securing the loan is a primary residence, not an investment property.  In 2006 and 2007, they made about 40 loans, for a total of around $4 to $5 million, per year.

24.  Jason Steinberg regularly represents lenders in loan closings, including his brother, father and uncle as well as conventional lenders like large banks.  When he does closings for the Steinbergs, Jason Steinberg prepares the promissory note and mortgage document, makes sure judgments are cleared from the title in advance, gets authorization from the borrower for the broker's payment and any disbursements to third parties, schedules the closing, prepares a closing statement and cuts the checks at the closing.  Ronald Steinberg either wires funds for the loan to Jason Steinberg or writes him a check before the closing.  Jason Steinberg typically does not meet the borrower prior to the closing.

25.  With respect to the Steinbergs' refinance loans, borrowers typically do not have an attorney at the closing.

D.   <u>March 16, 2007 Closing</u>

26.   The closing on the loan from the Steinbergs to Wholistic Change, LLC took place on March 16, 2007 in the conference room at Jason Steinberg's office in Stony Point, New York.

27.   Almonte accompanied plaintiff to the closing. Also in attendance were Jason and Ronald Steinberg, Kotch, Kathy Winrock, who was there as the title closer from Innovative Title Agency, LLC, possibly Richard Steinberg, and, intermittently, Jason Steinberg's secretary.

28.   The closing was the first time any of the Steinbergs had met plaintiff or Almonte.

29.   Almonte was introduced to Jason and Ronald Steinberg as "Max."  He was wearing a suit and sat next to plaintiff during the closing, explaining papers to her and showing her where to sign.

30.   Either at the beginning of the closing or at some point before the closing, Kotch had plaintiff sign papers to form the corporation Wholistic Change, LLC.

31.   At the beginning of the closing, plaintiff signed a deed transferring 653 Jacey Drive to Wholistic Change, LLC (DX 12).  The deed had been prepared by Rachelle Perez of Innovative Title Agency (DX 12).

32.  At some point during the closing, plaintiff told Jason and Ronald Steinberg that she was renting out the 653 Jacey Drive property for $2,800 a month.

33.  Plaintiff challenged the amount she was to pay the title company, Innovative Title Agency, LLC, for title insurance, recording fees and to put in escrow to satisfy judgements against her -- arguing that the $82,704.00 proposed was far more than the judgments that appeared on her credit report.  This dispute was eventually resolved after a phone conversation between Kathy Winrock and Rachelle Perez from Innovative Title Agency, and it was agreed that plaintiff would pay the title company $82,704.00 to put in escrow.

34.  After plaintiff approved the sum going to the title company, Jason Steinberg prepared the closing statement (DX 7) and handed out copies to plaintiff and the others present at the closing.

35.  The closing statement reflected the following amounts, totaling $275,000, to be distributed from the loan proceeds (DX 7):

> a. $69,027.25 to Wholistic Change, LLC
>
> b. $82,704.00 to the title company (covering title insurance, recording fees and escrow)
>
> c. $750.00 to Jason Steinberg (for the closing fee)

     d. $2,750.00 to Ronald Steinberg (one-third of the three points for the loan initiation fee)

     e. $2,750.00 to Richard Steinberg (one-third of the three points for the loan initiation fee)

     f. $2,750.00 to David Steinberg (one-third of the three points for the loan initiation fee)

     g. $1,718.75 as prepaid interest for the period March 16-31, 2007

     h. $150.00 for inspection (charged by the Steinbergs for evaluating the property)

     i. $8,250.00 to Steve Gold ("Be Approved")

     j. $104,000.00 to Private Lenders (authorized by plaintiff as "managing member" of Wholistic Change, LLC (DX5))

     k. $150.00 to the title closer (Kathy Winrock)

36.   After ensuring there were no remaining disputes, Jason Steinberg, sitting at the closing table, wrote checks from his IOLA account in the following amounts to the following parties[2] (DX 8):

     a.  $3,371.91, payable to David Steinberg[3]

---

[2]The check for $750.00 to Jason Steinberg was not submitted into evidence.

[3]The share for each of the Steinbergs reflects the $2,750
                    (continued...)

b.  $6,746.84, payable to Ronald Steinberg[4]

c.  $82,704.00, payable to Innovative Title

Agency, LLC

d.  $150.00, payable to Kathy Winrock

e.  $104,000.00, payable to Private Lenders

Referral Service Inc.[5]

f.  $8,250.00, payable to Be Approved

g.  $69,027.25, payable to Margaret Cullen[6]

37.  At the closing plaintiff signed the mortgage document (DX 2) and promissory note (DX 1).  Almonte showed her where to sign as she went through the papers.  The loan as described in the note and mortgage document was for a one-year term, at 15% interest and three points, all closing expenses to be paid by the borrower, and secured by the 653 Jacey Drive property (DX 1; DX 2).

---

[3] (...continued)
charged as one-third of the three points for the loan initiation fee, plus one-third of the $1,718.75 in prepaid interest, plus one-third of the $150.00 inspection fee.

[4] This check represents the disbursements to both Ronald and Richard Steinberg.

[5] This is the name of the company Kotch was purportedly going to use to buy and sell foreclosed homes with plaintiff.

[6] At plaintiff's request, Jason Steinberg wrote the borrower's check to plaintiff rather than Wholistic Change, LLC. Plaintiff told him that she did not yet have a separate bank account for Wholistic Change, LLC.  The memo line on the check indicates "for Wholistic Change" (DX 8(g)).

38.  As the attendees walked out after the documents were signed, plaintiff asked Ronald Steinberg how she should make the monthly payments.  He handed her his business card with the address for sending the first payment.

39.  At the conclusion of the closing, Kotch and Ronald Steinberg had a conversation concerning another potential loan transaction not involving plaintiff.

40.  I find that, contrary to plaintiff's testimony, but consistent with that of Ronald Steinberg, Jason Steinberg and Kathy Winrock, at no point during the closing did plaintiff ask for a lawyer or state that she needed one.

41.  I also find that Ronald Steinberg did not state, as plaintiff testified, that plaintiff did not need to worry about making the monthly loan payments because she was going to make substantial profits with Kotch.

42.  After the closing Kotch told plaintiff he would set up a meeting the following week between her and his lawyer regarding their plans for buying and selling foreclosed homes.

E.  Events Subsequent to the
    March 16, 2007 Closing

43.  Plaintiff made the first monthly payment of $3,437.50 (for the April payment) in May 2007.

13

44.  At some point following the closing, Almonte and Kotch told plaintiff that her home was going to go into foreclosure because Wholistic Change, LLC was in default on the loan.

45.  Plaintiff called Ronald Steinberg and told him she wanted to pay off the loan.  Ronald Steinberg told her to call Jason Steinberg and ask for a payoff letter.  Jason Steinberg subsequently advised plaintiff that as of August 21, 2007, she owed $289,781.25 on the loan (DX 10).  This amount was the sum of the $275,000.00 principal, four months interest at $3,437.50 per month, and late fees of $343.75 per month for May, June and July (DX 10).

46.  Gold told plaintiff that because she had bad credit and would not be able to get a loan in her name, she needed to transfer the house to Almonte so that he could get a new loan to pay off the Steinberg loan.  Gold or Almonte told plaintiff that the transfer would be temporary, and plaintiff believed that the title would be in Almonte's name for only a couple of months.

47.  Once plaintiff knew the loan was going to be repaid in full, she called Ronald Steinberg to ask for the first payment back.  He told her he would not return it, as it was not included as part of the payoff amount cited in Jason Steinberg's letter.

14

48.  Neither Kotch nor any lawyer retained by Kotch ever followed up with plaintiff regarding plaintiff and Kotch's plans to buy and sell foreclosed homes, despite repeated calls from plaintiff.

E.  <u>August 24, 2007 Closing</u>

49.  On August 24, 2007, a closing took place at 653 Jacey Drive, at which plaintiff, Almonte, Gold, and a title closer, but no lawyers, were present.  None of the Steinbergs attended this closing.

50.  At this closing plaintiff signed a deed transferring title to 653 Jacey Drive from Wholistic Change, LLC to Almonte (DX 13).  Despite a notation on the deed indicating consideration of $490,000 and that "the grantor acknowledges receipt of this money," (DX 13) plaintiff did not receive $490,000 from Almonte.

51.  As a result of the closing Almonte obtained a loan of $367,500 from World Savings Bank, secured by the 653 Jacey Drive property (DX 14).

52.  On August 26, 2007 plaintiff received $52,000 from the proceeds of this loan by wire transfer from the title company.

53.  The unpaid balance of the Steinberg loan, $289,781.25, was paid from the proceeds of Almonte's loan; Jason

Steinberg received the repayment directly from World Savings
Bank.  In addition, Kotch and Gold each received some portion of
the proceeds of the World Bank Savings Loan.

54.  Plaintiff did not realize 653 Jacey Drive had been
permanently conveyed to Almonte until November 2007, when she
received a deed in the mail and saw the house was still in
Almonte's name.

55.  Plaintiff commenced this action in July 2008.

F.  Plaintiff's Losses

56.  653 Jacey Drive is now in Almonte's name and went
into foreclosure in early 2008.

III.  Conclusions of Law and Findings
of Fact that are Dependent Upon
the Applicable Principles of Law

A.  Jurisdiction and
Applicable Law

57.  This Court has subject matter jurisdiction under
28 U.S.C. § 1332(a)(2) based on the diverse citizenship of the
parties.

58.  Because no party disputes the applicability of New
York law to this dispute, I find that New York law governs
plaintiff's claims in this matter.

B.  <u>Plaintiff's Claims</u>

59.  Plaintiff asserts three claims against the defendants:

        a.  fraud

        b.  violation of New York Judiciary Law § 487

        c.  usury

60.  Plaintiff's first claim alleges that defendants fraudulently induced her to take out the loan in Wholistic Change LLC's name through (1) Jason Steinberg's alleged statement that plaintiff did not need an attorney for the closing and (2) Ronald Steinberg's alleged statement that plaintiff did not need to worry about the monthly loan payments because she would be making substantial profits with Kotch.

"To state a claim for fraudulent misrepresentation under New York law 'a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.'"  <u>Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.</u>, 375 F.3d 168, 186-87 (2d Cir. 2004), <u>quoting</u> <u>Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank</u>, 57 F.3d 146, 153 (2d Cir. 1995); <u>Nealy v. U.S. Surgical Corp.</u>, 587 F. Supp. 2d 579, 585 (S.D.N.Y. 2008) (Marrero, D.J.).

61.  I do not find plaintiff's testimony regarding these representations credible.  However, even if these statements had been made, any damage plaintiff sustained as a result of entering into this loan through Wholistic Change, LLC could not be attributed to reliance on the statements plaintiff alleges, because plaintiff clearly decided to enter into the loan transaction before the alleged statements were made, and did in fact enter into the transaction before she alleges Ronald Steinberg's statement was made.

62.  More generally, there is no evidence of any intent to deceive plaintiff on the part of the defendants, nor is there any basis to infer collusion to deceive plaintiff between any of the defendants and Almonte or Kotch.

63.  Furthermore, plaintiff incurred no damages as the direct result of the alleged wrong, as she and Private Lenders received the proceeds of the loan and she paid back no more than the principal loan amount plus interest and late fees.  See In re Eugenia VI Venture Holdings, Ltd. Litig., 649 F. Supp. 2d 105, 121 (S.D.N.Y. 2008) (Batts, D.J.) ("In New York, damages for claims of fraud and fraudulent inducement are subject to the 'out-of-pocket rule,' which confines plaintiffs to recovering actual losses sustained as the direct result of the wrong alleged."), aff'd, 2010 WL 1049289 (2d Cir. Mar. 23, 2010); Cyberlease, LLC v. JP Morgan Chase Bank, No. 04 Civ. 1221 (NRB),

2005 WL 2030317 at *8 (S.D.N.Y. Aug. 22, 2005) (Buchwald, D.J.);
Reno v. Bull, 226 N.Y. 546, 553, 124 N.E. 144, 146 (1919); Starr
Found. v. Am. Int'l Group, Inc., 2010 WL 2104535 at *1 (N.Y. App.
Div. 1st Dep't May 27, 2010).

64. Accordingly, plaintiff's claim for fraud fails.

65. Plaintiff's second claim alleges that Jason
Steinberg violated New York Judiciary Law Section 487 by deceiv-
ing or colluding to deceive plaintiff. Section 487 provides:
"[a]n attorney or counselor who . . . [i]s guilty of any deceit
or collusion, or consents to any deceit or collusion, with intent
to deceive the court or any party . . . [i]s guilty of a misde-
meanor, and in addition to the punishment prescribed therefor by
the penal law, he forfeits to the party injured treble damages,
to be recovered in a civil action."

66. Section 487 only applies to an attorney's conduct
in a pending judicial proceeding. Mahler v. Campagna, 60 A.D.3d
1009, 1012-13, 876 N.Y.S.2d 143, 147 (2d Dep't 2009); Jacobs v.
Kay, 50 A.D.3d 526, 527, 857 N.Y.S.2d 81, 83 (1st Dep't 2008);
Tawil v. Wasser, 21 A.D.3d 948, 949, 801 N.Y.S.2d 619, 620 (2d
Dep't 2005) (Judicary Law Section 487 did not apply to conduct by
attorney in a real estate transaction); Henry v. Brenner, 271
A.D.2d 647, 648, 706 N.Y.S.2d 465, 466 (2d Dep't 2000); Stanski
v. Ezersky, 228 A.D.2d 311, 313, 644 N.Y.S.2d 220, 223 (1st Dep't
1996).

19

67.   None of the alleged conduct by Jason Steinberg took place in the context of a judicial proceeding.

68.   Further, I find no deceit or collusion on the part of Jason Steinberg with the intent to deceive plaintiff.

69.   Accordingly, Jason Steinberg did not violate Section 487 of the Judiciary Law of the State of New York in connection with the loan to Wholistic Change, LLC.  Thus, plaintiff's second claim fails.

70.   Plaintiff's third claim alleges that the loan made by the Steinbergs to Wholistic Change, LLC was usurious.  Under New York law, a loan is usurious if the interest rate exceeds sixteen percent.  N.Y. Gen. Oblig. L. § 5-501(1); N.Y. Banking L. § 14-a(1); O'Donovan v. Galinski, 62 A.D.3d 769, 769, 878 N.Y.S.2d 443, 444 (2d Dep't 2009); Matias v. Arango, 289 A.D.2d 459, 460, 735 N.Y.S.2d 157, 158 (2d Dep't 2001).  Loans to corporations are generally not subject to New York's civil usury laws.  See Scantek Med., Inc. v. Sabella, 582 F. Supp. 2d 472, 474 (S.D.N.Y. 2008) (McMahon, D.J.); MacQuoid v. Queens Estates, 143 A.D. 134, 135-36, 127 N.Y.S. 867, 868-69 (2d Dep't 1911); Isle of Wight Co. v. Smith, 51 Hun. 562, 4 N.Y.S. 73, 73 (2d Dep't 1889).  Loans to corporations may be subject to the civil usury statute, however, in cases where "the principal asset of [the corporation is] ownership of a one or two family dwelling, where it appears either that the said corporation was organized

and created, or that the controlling interest therein was ac-
quired, within a period of six months prior to the execution, by
said corporation of a bond or note evidencing indebtedness."
N.Y. Gen. Oblig. L. § 5-521(2).  This provision "was designed to
prevent the practice of having lenders use a corporate device to
obtain usurious rates of interest through loans secured on one or
two-family homes which were transferred to a corporation for that
purpose."  Brint v. Ellin Express Corp., 51 Misc. 2d 796, 797-98,
273 N.Y.S.2d 860, 862 (Sup. Ct. 1966), aff'd, 28 A.D.2d 825, 282
N.Y.S.2d 450 (2nd Dep't 1967); see also Koppell v. McNeil  21
Misc. 2d 237, 239, 190 N.Y.S.2d 26, 29 (Sup. Ct. 1959).

          71.  Whether or not the loan at issue in this action is
subject to the usury statute, it does not exceed the civil usury
rate.  The interest rate set forth in the note was 15% for the
one-year term of the loan.  This rate is consistent with the
interest plaintiff was actually charged over the five-and-a-half-
month period during which the loan was outstanding:  the
$1,718.75 pro rata interest payment plaintiff made for second
half of March at the March 16 closing, the $3,437.50 interest
payment she paid for April, and the four monthly interest pay-
ments of $3,437.50 each, made for May, June, July and August
pursuant to the payout letter (DX 10).  ($275,000 x 0.15 / 12
months = $3,437.50 per month; $3.437.50 / 2 = $1,718.75 for the
second half of March).

72.  Plaintiff was also charged 343.75 x 3 = $1031.25 in late fees pursuant to the payout letter; however, late fees are not considered interest under New York's usury law.  N.Y. Comp. Codes R. & Regs. Tit. 3, § 4.3(g)(2).

73.  Plaintiff also paid three "points" at the closing: $2,750.00 each to Ronald, Richard and David Steinberg.  Interest includes such "origination fees [or] points . . . paid . . . to or for the account of the lender in consideration for making the loan or forbearance" where the loan is "secured primarily by an interest in real property improved by a one- or two-family residence occupied by the owner."  N.Y. Comp. Codes R. & Regs. tit. 3, § 4.2(a).  On March 16, 2007, when the loan was made and the points were assessed, plaintiff was not living at 653 Jacey Drive.  Between January 2006 and late March 2007, she was living at 1400 Outlook Avenue in the Bronx.  In addition, Jason Steinberg was told by Gold that 653 Jacey Drive was an investment property and plaintiff stated at the closing that she was renting out the property at the time.  Accordingly, the points are not appropriately considered interest here.

74.  Thus, the loan had an interest rate below sixteen percent and, accordingly, was not usurious.

IV.   Conclusion

Accordingly, for all the foregoing reasons, I conclude that defendants are entitled to judgment on all of plaintiff's claims against them and that those claims are hereby dismissed with prejudice.

Dated:  New York, New York
        June 21, 2010

                                        SO ORDERED

                                        _____
                                        HENRY PITMAN
                                        United States Magistrate Judge

Copies transmitted to:

Peter S. Gordon, Esq.
Gordon & Gordon, P.C.
108-18 Queens Boulevard
Forest Hills, New York 11375

Morton I. Baum, Esq.
Baum Law Offices, LLP
438 Broadway, P.O. Box 1260
Monticello, New York 12701